IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHELLE HESS, | CASE NO. 1:24-cv-679 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Michelle Hess filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to this Court's jurisdiction in this case. Doc. 6. For the following reasons, the Court affirms the Commissioner's decision.

**Procedural background**

In April 2020, Hess filed an application for disability insurance benefits, alleging a disability onset date in November 2016.[1] Tr. 118, 367. In pertinent part, Hess alleged that she was disabled and limited in her ability to work due to: essential hypertension, anxiety, exacerbated asthma, COPD, ulcerative

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

colitis, ischemic colitis, clostridium difficile colitis,[2] moderate protein-calorie malnutrition, retraction of stoma, and intestinal stoma prolapse. Tr. 118. The Commissioner denied Hess's application initially and on reconsideration. Tr. 117, 126.

In February 2021, Hess requested a hearing. Tr. 178. Administrative Law Judge (ALJ) Penny Loucas held a telephonic hearing in September 2021. Tr. 76. Hess appeared, testified, and was represented by counsel at the hearing. *Id.* Qualified vocational expert Michael Klein also testified. Tr. 103. In October 2021, the ALJ issued a written decision, which found that Hess was not entitled to benefits. Tr. 135.

In October 2021, Hess appealed the ALJ's decision to the Appeals Council. Tr. 302. In October 2022, the Appeals Council remanded Hess's case back to the ALJ to address specific issues it identified in the ALJ's initial decision. Tr. 159. In February 2023, the ALJ held a second telephonic hearing. Tr. 51. Hess appeared, testified, and was represented by counsel at this hearing. *Id.* Qualified vocational expert Rebecca Williamson also testified. Tr. 71. In June 2023, the ALJ issued a written decision, which again found that Hess was not entitled to benefits. Tr. 14.

---

[2]     Clostridium difficile colitis, also referred to as c. difficile or c. diff., is a bacterium that causes infections in the colon. C. diff. is often contracted after a course of antibiotic treatment and in a hospital or long-term care facility setting, though not necessarily. Symptoms range from diarrhea to more serious or life-threatening issues. Mayo Clinic, Diseases & Conditions, *C. Difficile Infection*, https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691 [**https://perma.cc/3SKZ-EQPS**].

In February 2024, the Appeals Council denied Hess's second appeal, Tr. 1, making the ALJ's June 2023 decision the final decision of the Commissioner. Tr. 14; *see* 20 C.F.R. § 404.981.

Hess timely filed this action in April 2024. Doc. 1. In it, she asserts two issues for the Court's review:

> 1.   Whether the administrating law judge properly evaluated plaintiff's bowel impairment due to colitis, including requiring rest room allowances.
>
> 2.   Whether the ALJ properly relied on the state agency reviewers' opinions, where the reviewers' opinions assessed a different period of time than the period adjudicated by the administrative law judge.

Doc. 8, at 1.

**Evidence[3]**

   *1.   Personal, Education, Vocational Evidence*

Hess was born in 1974 and was 42 years old as of her alleged onset date. Tr. 118. She graduated from high school and obtained a teaching degree. Tr. 87. From 2006 until 2016, she worked as a "digital teacher," meaning she taught students online. Tr. 86.

   *2.   Medical Evidence*

In April 2018, Hess visited the emergency room and was treated by Kristen Patterson, CNP, who was supervised by Dr. Maher Azzouz, M.D., a

---

[3]   The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefing.

gastroenterologist. Tr. 829. Hess described severe left lower stomach pain and had stomach bloating. *Id.* She had a low-grade fever and nausea without vomiting and stated she had not eaten much over the previous weekend due to her symptoms. Tr. 830. An abdominal CT scan was suggestive of inflammatory infectious colitis. Tr. 829. Intravenous antibiotics were administered. *Id.* Nurse Patterson noted that Hess's symptoms suggested colitis, which was likely infectious, but could possibility be ischemic or inflammatory. Tr. 833.

Also in April 2018, Hess underwent a partial colectomy, performed by Ching Feng Lai, D.O., which involved placement of an ostomy bag due to a c. diff. infection and necrotic bowel tissue. Tr. 1586. During a postoperative examination by Dr. Lai, Hess continued to describe abdominal pain and had some drainage from her surgical incision. *Id.* Dr. Lai treated Hess's incision drainage and re-closed the wound. *Id.*

In May 2018, during an admission for a bowl obstruction, Hess was seen by a gastroenterologist, due to concerns for gallstones and a dilated biliary tree. Tr. 827. Hess's bowel obstruction resolved by itself and she was passing stool, but she complained of epigastric pain and right upper abdominal pain with nausea. *Id.* On examination, she had tenderness throughout the abdomen which the doctor was unable to localize. *Id.*

Also in May 2018, Hess had a post-operative visit with George Seikel, M.D., following surgery to remove dead tissue from her large intestine. Tr. 609.

4

Dr. Seikel noted Hess's existing diagnoses and that she had an ileostomy[4] in place. *Id.* Hess was eating and creating stool and her ileostomy seemed to be working well. *Id.* Dr. Seikel also remarked that Hess experienced chronic pain and renewed her prescription for Oxycodone. *Id.* Dr. Seikel further noted a plan to reverse Hess's colostomy in the future and to remove her gallbladder. Tr. 610.

In June 2018, Hess saw Dr. Lai for post-operative appointment following the reversal of her colostomy. Tr. 1599. Dr. Lai irrigated and redressed Hess's wound. *Id.* In July 2018, when Dr. Lai saw Hess again, she had two open wounds, one over the site of the colostomy and the other over her mid-lower abdominal incision. Tr. 1604. A wound culture showed methicillinresistant staphylococcus aureus but the infection was improving with antibiotics. *Id.* In September 2018, Dr. Lai saw Hess once more. Tr. 1618. Hess had a spot on her surgical incision that had not healed and was draining fluid and some blood. *Id.* Dr. Lai treated Hess's wound with silver nitrate to facilitate closure. *Id.*

In August 2019, Hess reported to the emergency room describing abdominal pain and diarrhea. Tr. 843. Hess described persistent abdominal

---

[4]  An ileostomy is a surgical procedure by which a surgeon creates a hole in the abdominal wall and brings the small intestine through this hole.  The procedure brings out part of the small intestine, called the ileum, and stiches it to the hole in the abdominal wall so that the small intestine will empty through the hole into a bag, called an ostomy bag. *Ileostomy*, Cleveland Clinic, Health                              Library,                              Procedures, https://my.clevelandclinic.org/health/procedures/21726-ileostomy [**https://perma.cc/XZD2-9KNJ**].

pain and a low-grade fever. Tr. 846. On examination, Hess appeared to be in acute pain and was tachycardic and hyperventilating, which the emergency room doctor believed was due to her pain. *Id.* Hess's lab work showed chronic anemia and her abdomen showed generalized tenderness. Tr. 849–51. A CT scan of Hess's abdominal area showed "moderate fluid versus right adnexal cyst in the right aspect of the pelvis," Tr. 850, which the doctor thought might have caused her pain. Tr. 851. A pelvic ultrasound showed a right ovarian cystic lesion. Tr. 853. Hess's doctor planned to admit Hess for further evaluation, Tr. 851, but Hess declined admission and left the hospital against medical advice, Tr. 860.

In October 2019, Hess underwent a colonoscopy and esophageal duodenoscopy.[5] Tr. 947. Hess described constant dull abdominal pain at a pain level of three out of ten. Tr. 951. On examination, her bowel sounds were hyperactive, and her abdomen was soft, non-tender and without rigidity. Tr. 952. The EGD was normal, Tr. 968, but the colonoscopy was limited due to poor bowel preparation. Tr. 971. It was, however, read as normal within the limited visualization that could be achieved. Tr. 971. The physician conducting the examinations recommended that Hess repeat the study. Tr. 972.

---

[5]     Esophageal duodenoscopy, or an EDG examination, involves insertion of a scope through the esophagus and into the upper esophagus and stomach. Cleveland Clinic, Diagnostics & Testing, *Esophageal duodenoscopy*, https://my.clevelandclinic.org/health/diagnostics/22549-esophagogastroduodenoscopy-egd-test **[https://perma.cc/M4A6-JEGG].**

In February 2020, Hess reported to the emergency room for abdominal pain. Tr. 782. The emergency room physician noted Hess's history of bowel resection, colostomy, and colostomy reversal. *Id.* Hess described her pain as similar to her pain around the 2018 bowel surgery and noted that her most recent bowel surgery was in June 2019. *Id.* Hess had nausea without vomiting and denied any constipation, diarrhea, or bloody stool. *Id.* The emergency room doctor ordered a CT scan of her abdomen, ordered labs, and administered Dilaudid for pain and Zofran for nausea. Tr. 783. Hess's abdominal CT scan showed constipation with distension of the right colon with "considerable" retained stool. Tr. 788. Hess's diagnosis was "abdominal pain, nausea, leukocytosis and colitis." Tr. 784. Hess's provider recommended that Hess be transferred to another institution, but she declined to be transferred and left the emergency room against medical advice. Tr. 784.

Later in February 2020, Hess again presented at an emergency room with abdominal pain and nausea after vomiting for two days. Tr. 1304. The physician noted her visit to another emergency room the week before. *Id.* Hess was admitted for a gastrointestinal consult and on examination, her abdomen was tender. Tr. 1307. A CT of Hess's abdomen and pelvis showed new symmetric wall thickening which raised concerns about possible malignancy. Tr. 1310. Hess had no bowel obstruction. *Id.* During her hospitalization, Hess underwent a colonoscopy, which showed inflammation of her colon and her

previous bowel resection. Tr. 1427. Hess was discharged with a final diagnosis of ischemic colitis. Tr. 1312.

In March 2020, Hess underwent an open subtotal colectomy at Fairview Hospital. Tr. 2106–2107. She was discharged approximately a week later, Tr. 2032, but returned to Fairview Hospital the following day reporting abdominal pain and nausea, Tr. 2359. The colorectal surgeon did not feel that additional surgery was needed but he admitted Hess for observation. Tr. 2364. She was discharged home several days later with improvement in her pain. Tr. 2368. Four days after her discharge, Hess was readmitted for abdominal pain and vomiting. Tr. 4807. Imaging of Hess's abdomen showed a small bowel obstruction, which resolved with treatment. Tr. 4808.

In July 2020, Hess followed up with her colorectal surgeon who noted that she was doing well with minimal pain. Tr. 4285. Hess described that, when she had pain, it was typically a sharp pain in her lower abdomen. Tr. 4285. No further follow-up appointments were scheduled. Tr. 4289.

In October 2020, Hess was treated by a gastroenterologist who noted that Hess described ongoing right-sided abdominal pain and five to seven bowel movements per day. Tr. 4592. Hess was anemic and she reported fatigue. Tr. 4592–4593. On examination, Hess's lower right stomach was tender to palpation, but the gastroenterologist felt that this was out of proportion to her condition. Tr. 4593.

In November 2020, Hess had another colonoscopy. Tr. 4754. Hess's gastroenterologist noted that Hess's abdominal pain was likely due, in part, to chronic-opioid-use-induced constipation. *Id.*

In May 2021—after Hess's date last insured—a treatment provider again noted Hess's constipation with narcotic dependence. Tr. 4745. Hess weighed 141 pounds and her treatment plan included narcotic avoidance and MiraLAX. Tr. 4748–49.

*3.    State Agency Consultants*

In October 2020, state agency reviewer Diane Manos, M.D., found that Hess had the residual functional capacity (RFC)[6] to perform light work, with occasional climbing of ramps and stairs, but no climbing of ladders, ropes or scaffolds. Tr. 123. Dr. Manos also found that Hess could frequently balance, stoop, kneel crouch, and crawl. *Id.* Dr. Manos indicated that her findings were based on a period beginning after April 2019, because Hess had an April 2019 denial of a previous disability claim. Tr. 2014. On reconsideration, Leslie Green, M.D., affirmed Dr. Manos's initial findings. Tr. 131–132.

*4.    Hearing Testimony*

*4.1*  In September 2021, the ALJ held a telephonic hearing at which Hess, who was represented by counsel, testified. Tr. 76. Hess described a

---

[6]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir 2004) (quoting *Howard*, 276 F.3d at 239).

traumatic event, during which she found her boyfriend's body, after he died by suicide. Tr. 91. She testified that during this event she had lost consciousness, fell, and injured her leg. Tr. 91–92. Hess explained that she also developed carpal tunnel syndrome from using crutches while her leg fracture healed. Tr. 92. Hess stated that her carpal tunnel syndrome caused her ongoing trouble with grasping objects. Tr. 93. She also described that since this traumatic event, she had experienced post-traumatic stress syndrome, which included flashbacks to finding her boyfriend's body. Tr. 100–101

Hess further testified that due to anxiety she no longer drove . Tr. 93. She also said that her mother helped with her children and completing household chores. Tr. 93, 96–97. Hess stated that she suffered from low back pain which limited her ability to stand and sit.  Tr. 96–97. Hess estimated that due to her pain, she would typically spend four to five hours per day lying down during the daytime. Tr. 99. Hess stated that she would also use a heating pad to help alleviate her low back and abdominal pain. Tr. 98. Hess described pain in her left leg and right knee as well. Tr. 99. Hess also stated that that she had a poor ability to concentrate due to attention-deficit hyperactivity disorder, for which she took medication. Tr. 101.

Hess testified about her gastrointestinal issues, which she confirmed "became the major problem" for her in 2018. Tr. 94. She stated that she underwent a partial colectomy that year and that in the three years since this surgery her "quality of life is terrible." Tr. 95. Hess described being in the

restroom "constantly," estimating that, at a minimum, she would use the restroom ten times per day and that she would have "accidents" at night, as well. Tr. 96. She stated she cannot eat certain things and experienced constant abdominal pain, vomiting, and diarrhea. *Id.* Hess also testified that she was hospitalized on two occasions due to bowel obstructions. *Id.* She further testified that she was afraid to leave her home because she could never predict when she might need to use the bathroom. *Id.*

*4.2* In February 2023, following the Appeals Council remand, Hess testified and was represented by counsel at a second hearing. Tr. 51. Hess again described her gastrointestinal issues and that she would need to get to the bathroom within about 30 seconds of feeling the need to use the bathroom "because it's coming regardless." Tr. 62. She stated that she now used the bathroom at least ten or 15 times per day. *Id.* Hess also testified that she soiled herself at least twice in a month, Tr. 64, and that she wore protective undergarments. Tr. 65.

Hess described other symptoms such as back and knee pain, along with asthma and some symptoms related to her carpal tunnel syndrome that remain post-surgery. Tr. 65–70. She also explained that she and three of her children have moved into her parents' house and that her mother helps her. Tr. 71. Hess testified that her daily activities remain the same as they were when she testified at the first hearing. Tr. 71.

11

5.    *Vocational Expert Testimony*

*5.1* During the September 2021 hearing, qualified vocational expert Michael Klein testified. Tr. 103. Klein described Hess's past work as a teacher to be a light exertional and skilled occupation, but clarified that Hess performed the job at a sedentary exertional level. *Id.* He also testified, in response to the ALJ's description of a hypothetical individual, that the hypothetical individual could perform Hess's past relevant work. Tr. 104. The ALJ then modified the hypothetical individual's description from standing to sitting every 30 minutes. Tr. 104–105. Klein stated that with that modification, the second hypothetical worker could perform the job of teacher in the manner that Hess had actually performed it, but could not perform the job as it was described in the DOT.[7] Tr. 105. Klein also stated that, based on his experience, tardiness or absences more than once per month would preclude competitive work. Tr. 105–106. In response to questioning by Hess's counsel, Klein stated that a hypothetical individual, as described in the ALJ's first hypothetical, who was required to drive to work on a once-a-week basis would not be able to perform Hess's past relevant work. Tr. 107.

*5.2* At the February 2023 hearing, qualified vocational expert Rebecca Williamson testified. Tr. 72. The ALJ described the following hypothetical

---

[7]    DOT stands for the Dictionary of Occupational Titles. It is a standard classification of occupations established by the Social Security Administration. The DOT includes descriptions of the physical demands, environmental factors, and skill levels for various occupations.

individual for Williamson's consideration: capable of performing work at the light exertional level; never capable of climbing ladders, ropes or scaffolds and only occasionally climbing ramps and stairs; capable of frequent balancing, stooping, kneeling, crouching and crawling; required to avoid more than occasional exposure to respiratory irritants; never work around dangerous moving equipment or operating dangerous equipment; and who "should avoid work in warehouse or construction-type areas, factory settings, no commercial driving, and no mental limitations" Tr. 72–73. In response, Williamson stated that the hypothetical individual could perform Hess's past relevant work of a teacher, as she performed it. Tr. 73.

Williamson further testified that being off task more than ten percent of a workday would be work prec. Tr. 73. She confirmed, in response to the ALJ's questioning, that it is "a federal and/or state law that employers provide bathroom facilities in their place of business." Tr. 73–74.  She also confirmed to Hess's counsel that she was not a lawyer and was "not versed in the legal aspects of" an employer's obligation to provide employees with access to a restroom. Tr. 74.

In response to questioning by Hess's counsel, Williamson testified that, if in addition to the limitations in the ALJ's hypothetical, the individual had added limitations requiring her be within 30 feet of a restroom while working and to have "at will" access to the restroom, that the individual could not perform Hess's past relevant work. Tr. 74. She further stated that a

hypothetical worker who needed to use the restroom once per hour for about ten minutes each time, could also not perform the job of a teacher, absent an accommodation. Tr. 74–75.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2021.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 26, 2016 through her date last insured March 31, 2021 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: ischemic colitis due to C-diff with peritonitis, s/p partial left colectomy with mucus fistula (MF), appendectomy due to ischemic bowel in April 2018, s/p side to side colocolonic anastomosis, subtotal colectomy due to ongoing ischemia complicated with malnutrition, retraction of stoma and intestinal stoma prolapse in March 2020; anemia; asthma; degenerative disc disease of the lumbar spine; degenerative joint disease of the right knee with lateral meniscal tear, s/p lateral meniscectomy in January 2021; and chronic pain syndrome (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with lifting up to 20 pounds occasionally and 10 pounds frequently; can never climb ladders, ropes or scaffolds, occasionally climb ramps and stairs; frequently balance, stoop, knee, crouch and crawl; avoid work that requires more than occasional exposure to respiratory irritants; no work at unprotected heights or around dangerous moving equipment or operating dangerous moving equipment such as power saws, jack hammers; should avoid work in a warehouse or construction type areas or factory settings; no commercial driving; and no mental limitations.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a teacher. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from November 26, 2016, the alleged onset date, through March 31, 2021, the date last insured (20 CFR 404.1520(f)).

Tr. 20, 25, 29, 41.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

15

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the

national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1. *The ALJ properly evaluated Hess's conditions and appropriately articulated the limitations in her RFC determination.*

Hess first argues that the ALJ erred by failing to include appropriate limitations related to Hess's colitis. Specifically, Hess asserts that the ALJ's RFC determination is "wholly insufficient to address the error found by the appeals counsel as to delineating [her] need for a restroom, and fails to comply with the case law under *McQuade*[.]" Doc. 8, at 18.

But Hess ignores the ALJ's decision in which she recognized why the Appeals Council remanded and then explained why the limitations Hess now proposes were not warranted. *See* Tr. 30–31. It is Hess's burden to show that the ALJ erred or that her decision is not support by substantial evidence. By ignoring the basis for the ALJ's decision and presenting her argument as if the ALJ offered no explanation, Hess is not off to a good start.

In any event, Hess claims that her testimony regarding her frequent and urgent bathroom requirements is consistent with the record and supported

18

additional limitations related to her gastrointestinal conditions. Doc. 8, at 18–19. But the ALJ went into great detail to demonstrate why that is not the case. *See* Tr. 30–41. As the ALJ reasoned, Hess's "real issue is intensity and frequency of the flareups" not "simply the frequency of having to go to the bathroom or proximity to a toilet." Tr. 30. So, the ALJ explained, it was more important to consider evidence in the record showing her diet compliance, medication management, and self-awareness of triggers to understand the affect of her symptoms on her daily functioning, rather than simply looking at her testimony regarding the frequency of her bowel movements. Tr. 30. The ALJ also found that evidence in the record contradicted Hess's testimony that she has not had normal bowel movements since 2018. *Id.* at 33. The ALJ further noted that records showed that Hess generally maintained her weight, which the ALJ reasoned would not have been possible if Hess were having bowel movements at least ten to 15 times each day. *Id.* The ALJ additionally found that with proper diet compliance and reversal of her ostomy, Hess fared better. *Id.* The record also showed, as the ALJ noted, that on several occasions treatment providers noted that Hess had normal bowel movements or experienced narcotic-induced constipated. *Id.* at 35–36. The ALJ's weighing of the medical evidence and testimony led her to craft an RFC which included certain postural and environmental limitations related to Hess's gastrointestinal conditions but did not result in a finding that limitations related to her access to a toilet were necessary. *See* Tr. 36. As the above

demonstrates, the ALJ provided sufficient explanation as to why certain evidence was not persuasive and why the functional limitations included addressed Hess's symptoms.[8] Hess's citation to other evidence that she urges supports a different conclusion does not mean the ALJ's decision was unsupported by substantial evidence. *See Jones*, 336 F.3d at 477.

Additionally, the primary decision Hess cites to support her position, *McQuade v. Commissioner of Social Security*, is distinguishable. No. 21-cv-834, 2022 WL 4375984 (N.D. Ohio Sept. 22, 2022). In *McQuade*, the claimant raised an argument that the ALJ's non-exertional limitation related to bathroom access was legally insufficient and too vague for review. *Id.* at *2. There the Court agreed with the McQuade's argument and other courts that had held "that when an ALJ includes a[n] RFC limitation concerning access to a restroom, the ALJ should also make a specific finding concerning the frequency and duration of the claimant's bathroom usage as part of the RFC." *Id.* at *3. Based on this reasoning, the Court remanded to the agency to address the frequency and duration of restroom breaks because the ALJ had crafted an RFC which included a limitation requiring access to a restroom. *Id.* at *4.

Here, the ALJ did not include any limitations related to access to a restroom. Instead, she found that that the postural limitations included in her

_____

[8] Hess has not raised any issue related to whether the ALJ appropriately discussed certain factors, such as supportability or consistency, when assessing the medical and non-medical evidence of record. Because Hess included no citation or clear argument that the ALJ failed to comply with applicable regulations, the Court has not addressed this issue.

RFC determination were sufficient to account for Hess's gastrointestinal conditions, including her colitis. *See* Tr. 39. So, the proposition in *McQuade*, that "*when an ALJ includes a RFC limitation concerning access to a restroom, the ALJ should also make a specific finding concerning the frequency and duration of the claimant's bathroom usage,*" 2022 WL 4375984, at *3,  is inapplicable.

Importantly, *McQuade* and the cases cited by that Court involved RFC determinations that expressly required "ready access to restroom facilities" or similar limitations specifically requiring access to restroom facilities. *See e.g.*, *Green v. Astrue*, No. 09-cv-331, 2010 WL 2901765, at *5 (E.D. Tenn. Jul. 2, 2010) (stating that "when a social security claimant has an impairment that requires her to have 'ready access to a bathroom' and the freedom to use it 'as needed,' an ALJ should 'make a specific finding concerning the frequency and duration of [the claimant]'s bathroom usage.'") (quoting *Brueggen v. Comm'r of Soc. Sec.*, 2006 U.S. Dist. LEXIS 92291, at *6 (W.D. Wis. 2006)). No such limitations were included in Hess's RFC and the ALJ adequately explained her reasoning as to why other limitations were appropriate. *See* Tr. 39–40 (including postural limitations and limitations on certain types of work, such as work at unprotected heights, warehouse or factory settings, and commercial driving).

As a final point, Hess asserts that "having found the bowel conditions to be severe, the ALJ's RFC had to necessarily address the limitations from that

condition." Doc. 8, at 19. Hess, however, provides no citation to any case law or regulation to support this assertion. And the ALJ included certain limitations to address Hess's gastrointestinal and other conditions, Tr. 39–40, but did not find any specific limitation requiring Hess have certain access to restrooms. That Hess disagrees with the ALJ's chosen limitations or believes additional limitations should have been included does not mean that the ALJ erred or that her RFC determination lacks support from substantial evidence. So Hess's first issue fails.

> 2.  *The ALJ did not err by finding that state agency reviewers findings were persuasive because the ALJ's decision shows she also considered the entirety of the record.*

In her second issue, Hess argues that the ALJ erred by relying on the "persuasive" opinions of the state agency reviewers. Doc. 8, at 19. Specifically, Hess notes that these doctors focused a time period—April 2019 to March 2021—which was narrower than the full period applicable to her claim— November 2016 to March 2021. *Id.* For several reasons, this argument fails.

For starters, Hess fails to recognize that state agency reviewers commonly base their opinions on an incomplete record. *See, e.g.*, *Jones v. Colvin*, No. 5:13-cv-1781, 2014 WL 4594812, at *3 (N.D. Ohio Sept. 12, 2014) ("[b]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.") (quoting *Chandler*

*v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3rd Cir. 2011)). So long as the ALJ considers the subsequent evidence and takes "into account any relevant changes in [the claimant's] condition," there is no error in the ALJ's reliance on the state agency reviewers' opinions. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). Here, the ALJ considered the entirety of the evidence, not just evidence within the timeframe identified by state agency reviewers. *See* Tr. 30–41 (examining the entirety of the record of evidence and testimony, not just the time frame considered by the state agency consultants). So procedurally, the ALJ did not err. *See McGrew*, 343 F. App'x at 32.

Additionally, the ALJ did not wholesale adopt the state agency reviewer's findings without modification. Instead, she considered the entire record. Indeed, she spent several pages cataloguing the evidence which covered the period before the time discussed by the state agency reviewers. *See* Tr. 31– 34. Further, the ALJ included greater limitations than the state agency reviewer suggested. And the ALJ did this because the reviewers failed to take into account all of the evidence. Tr. 40. So, even if the ALJ erred in analyzing the state agency reviewer's findings, the error—which benefitted Hess—is harmless at best. *See Pistole v. Kijakazi*, No. 3:20-cv-00249, 2021 WL 5238777, at *7 (E.D. Tenn. Nov. 10, 2021) (finding "harmless error at most" where an ALJ discounted medical opinion evidence but determined an RFC that was more restrictive than the medical opinion recommended); *see also Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June

16, 2022) ("The Court will not fault the ALJ for finding more restrictions" in the RFC than were suggested in the opinions of the state agency consultative examiners) (citations omitted).

Hess concludes by generally asserting that the ALJ's decision was not supported by substantial evidence. But, as described above, the ALJ's decision was supported by substantial evidence in the form of her citation to the medical records and her evaluation of the testimonial evidence. *See* Tr. 30–41. And, even if the ALJ had relied solely on the state agency reviewer's opinions, they can themselves provide substantial evidence for the ALJ's decision. *See Kurman v. Kijakazi*, No. 1:20-cv-1837, 2022 WL 1067568, at *7 (N.D. Ohio Jan. 13, 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision") (collecting cases), *report and recommendation adopted*, 2022 WL 765072 (N.D. Ohio Mar. 14, 2022). Further, to the extent that Hess attempts to point to other evidence of record that may support her desired outcome, her argument fails because "so long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997), *Jones*, 336 F.3d at 477. So, Hess's argument that the ALJ's decision is not based on substantial evidence lacks merit.

24

For the reasons explained above, I affirm the Commissioner's decision.

IT IS SO ORDERED.

Dated: November 6, 2024

_/s/ James E. Grimes Jr._
James E. Grimes Jr.
U.S. Magistrate Judge